Allen, J.
The first count in the declaration does not allege, that the answers to the interrogatories were material, or that Calloway had been sworn before he gave his answers : the words spoken do not constitute *471 slander at common law, and this count can only be supported under the statute against duelling. The second count is for words actionable at common law, the charge amounting to perjury. The defendant pleaded the general issue to the whole declaration, and tendered two special pleas of justification as to part of the words in the first count. Objection being made to the special pleas, they were rejected.
Upon these proceedings, the question now for the first time is presented for determination, whether it is competent to justify words actionable only under our statute against duelling. The history of that statute is familiar to all • it was an extreme measure, almost of questionable authority, and only to be justified by the enormity of the evil it was intended to cure. It makes killing in a duel murder in the first degree, incapacitates persons challenging or accepting a challenge from holding office, and prescribes a test oath to all taking office under the commonwealth. The effect of the statute has been most beneficial; the practice has been repressed. It exists almost a solitary example of legislation carried to the extremity of rigour, where the severity of the enactment has not defeated the policy of the law. In view of these benefits, but dreading the example, the convention to amend the constitution gave a constitutional sanction to a provision to effect this particular object; thereby shewing their sense of the benefits of this law; but guarding, by a sanction of it, from the application of the precedent to any other case, under the maxim ex-prés sio unius exclusio est alterius. Whilst the legislature was, by this strong measure, seeking to eradicate the evil, it could not but occur to it, that it was equally incumbent upon it, to provide some remedy for those injuries which most frequently led to the practice. The common law remedy by action of slander, had been found totally inadequate. Persons who might be accused of offences with any show of probability, rarely *472 thought of appealing to the (so called) code of honour. But personal insults, imputations upon the individual, or those having claims to his protection; to such indignities all might be exposed. The man of fair character might smile at the charge of theft or perjury, but stand ready, at the peril of his life, to resent a personal insult or indignity to himself or his wife or other relative. The insulting character of the words does not depend upon their truth or falsehood. They may be true, and their very truth give venom to the sting of insult. For such insults the legislature intended to provide a remedy, and by doing so, to deprive the offender against the duelling law, of the plea he offered in extenuation of his course : that the laws of his country afforded no adequate redress for insults and injuries to the wounded feelings of an honourable man. The statute declares “that all words which, from their usual construction and common acceptation, are considered as insults, and lead to violence and breach of the peace, shall hereafter be actionable, and no plea, exception or demurrer, shall be sustained in any court within this commonwealth, to preclude a jury from passing thereon, who are hereby declared to be the sole judges of the damages sustained with a proviso giving the courts the right to grant new trials. Looking to the policy of the statute, what constitutes the gravamen of the action given by it? Clearly, it seems to me, the insult to the feelings of the offended party. The court cannot say, whether the words are or are not insulting; that depends on the place, the manner and circumstances in which they are uttered. The literal meaning of the words may import praise; but, if spoken ironically and with intent to wound, theymay amount to the keenest insult. A man in that society where insults are most sensibly felt, may be told he is unfit for such company, that he is not a man of veracity; or his intellect may be disparaged in insulting terms: for such injuries the law intended to *473 provide redress. But if he sues, and is met with a plea of justification, and his whole life is to be investigated before an assembled community, his feelings would be doubly outraged. The law which proffers redress for in-suit, would furnish the opportunity of aggravating the outrage, and be itself an insulting mockery. So, in regard to allusions to personal defects, family misfortunes, and the like; insulting, and tenfold more so because of their truth. Were such insults intended to be redressed ? The maxim, that where the words spoken are true it is damnum absque injuria, cannot apply, it seems to me, to actions under this statute. The insult is the ground of action, and that the law considers injurious, whether true or false. No good can result, either to society or individuals, from tolerating insulting language. It imports nothing to society that a man’s personal defects, his family misfortunes, his mental peculiarities, &c. should be insultingly proclaimed to him. Whenever such insults are given, the jury are to pass upon them. No plea is to be received to preclude them from passing on the fact whether the words were spoken, whether from their usual construction and common acceptation they are insulting, and if so, what damages shall be allowed. But if a plea of justification is allowable, if true it bars the action, and no matter how insulting the words, or how great the damage, no redress can be afforded. It is said that if the statute is to receive this construction, words actionable at common law are also insults, and cannot be justified. To this it may be answered, first, that the statute does not in terms change the common law as to words theretofore actionable; and secondly, the legislature may very well have intended to leave cases of that kind as they were at common law. Crimes are rarely imputed without some ground of suspicion. If the party charged has been guilty, duty to society may justify the promulgation of the fact, that others may be on their guard against the perpetrator. No such excuse can be *474 alleged for insults. It seems to me, the expression of the law that no plea, exception, or demurrer shall be sustained to preclude a jury from passing thereon, extends to pleas of justification; and that, unless we give such construction to the statute, the whole object of the law will be defeated: whereas the other construction tends to advance the policy of the legislature. By subjecting the party to an action for the insult, without regard to the truth or falsehood of the insulting language, insults are repressed, and the controversies from which duels most generally arose, will be of rarer occurrence.
With respect to the motion for a continuance : if the question were open, I should be of opinion, that where the law does not give the right to continue, as in cases of revivor against a personal representative, but the application is to the discretion of the court, an appellate tribunal ought not to look into the question whether this discretion was properly exercised. The court below sees the party, hears his statement, and has had an opportunity of forming a correct opinion in regard to his motives. The party who applies is a witness in his own behalf: the application being addressed to the court, it must decide upon the credit to be given to his statements. Men of loose moral character are not restrained in such cases from making affidavits through fear of punishment. The facts, so far as they are open to examination, may be true; the witness may have been summoned, and be absent, without default of the party, and he will say he believes him to be material; but there is no means of ascertaining whether that belief is well or ill founded. It seems to me, the supreme court in Woods &c. v. Young, 4 Cranch 237. laid down the correct rule. The rule, however, has been settled otherwise in Virginia. But I am not disposed to extend it further than the court has already gone, and en-quire whether, in refusing to lay a case over to another day of the term, the court has exercised its discretion *475 properly. That will depend on an infinite variety of circumstances; the condition of the docket, the husiness in court, &c. To ascertain whether the court, in refusing to continue until the next term, exercised its discretion properly, we must look at the previous proceedings. At the April term 1837 the issue was made up and a general continuance entered. At September term 1837 the case was continued for defendant. At April term 1838, the defendant moved for a rule against his absent witnesses, and the cause was continued; it does not appear at whose costs, but the fair inference from the previous part of the order is, that the defendant moved for the continuance. At September term 1838, the cause was again continued at the costs of the defendant, and leave given to take the depositions of his witnesses. At April 1839 he again moved for a continuance, and took the exception under consideration. The history of the case is a sufficient reply to the defendant’s objections. Milstead v. Redman, 3 Munf. 219. was a much stronger case for a continuance. There the defendant obtained a continuance at November; at March, there was a verdict for the plaintiff, and a new trial; at May, the cause was continued for defendant; and at August term, he again moved for a continuance, because of the absence of two material witnesses, who had acknowledged service of the subpoena, and the husband of one of whom stated she was too ill to attend court. The motion to continue was overruled, and this judgment was affirmed. In this case, there had been three successive continuances, as 1 infer from the orders, at the instance of the defendant. This was the fourth application, and this after leave to take depositions had been given. As to the alleged misunderstanding of the terms of the order, the story is improbable. He had just obtained a continuance upon the terms of consenting on the record that the action was not to abate by the death of either party; the parties were personally present in court, and assented to *476 the entry; and how a party could construe an order ma<^e in his presence giving leave to take the depositions of his witnesses, on account of whose absence he had just obtained a continuance upon submitting to terms, into leave to read depositions taken in another cause, is somewhat surprising. I think he was properly ruled into a trial.
As to the hasty expression of the judge, referred to in one of the bills of exceptions, I pass it Avith the remark, that the exception is taken to the decision excluding, as I think most properly, the depositions taken in another cause. The expression used by the judge in excluding these depositions was not intended for the jury. So he informed them, and that it should not be regarded by them as any thing in the decision of the cause. Nothing is more common than an instruction to the jury to disregard evidence improperly admitted. The jury is presumed to possess ordinary intelligence, and to be able to discriminate between what is proper for them to consider in forming their conclusions, and what, though occurring in their hearing, is no part of the case. Here the court did all it could do to correct the inadvertence into which it had fallen.
After the verdict, the defendant moved for a new trial, upon the ground that the evidence did not warrant the finding, and because the damages were excessive. The new trial was refused, and the' defendant’s counsel drew up a statement of the facts supposed to be proved, and asked the court to examine the statement and add to and correct it, that it might appear of record what facts, in the opinion of the court, were proved on the trial. But the court refused to certify that the statement drawn up Avas a full and correct statement of all the material facts proved; or to correct the statement, so as to make it conformable to the truth. The reasons given for this refusal by the court in this case, are, I think, conclusive : that the testimony was conflicting, and it Avas the duty *477 of the jury to decide upon its credibility; that it was the province of the court to grant a new trial in cases only where there was no sufficient evidence to warrant the finding; that the decision of the court on a motion to set aside the verdict is evidence of its opinion that the jury had or had not submitted to them evidence, which, according to their belief of its credibility, warranted the verdict; and, therefore, the court overruled the motion for a new trial, because, in its opinion, there was abundance of testimony to warrant the finding, if the jury believed the plaintiff’s witnesses. In this view of the court below, I fully concur. But it was strenuously argued, that enough does appear to satisfy the mind that the damages were excessive, and therefore the judgment should be reversed and a new trial awarded. How can that appear to this court, when the facts upon which the jury proceeded are not before us ? But, so far as the facts do appear, it seems to me, the jury may have been fully warranted in giving the verdict they did. Brooks had filed an answer to a bill preferred against him by a third person: Calloway was called upon to give his deposition, and in doing so, contradicted Brooks’s answer. This may have been unpleasant to Brooks ; calculated to excite him; but Calloway, if his deposition was true, was blameless. The law compelled him to give it; and wdien examined as a witness, if his testimony conflicts with an answer sworn to by a party in the cause, does that authorize an imputation of perjury ? It further appears, that after the words charged in the declaration were uttered, Brooks applied to many persons to examine them as witnesses to do away Calloway’s testimony, as contained in his deposition. This he had a perfect right to do, either by shewing the deposition was false, or that the witness had made conflicting statements, or by impeaching his general character. But, to many of the persons so applied to, he represented the statements of Calloway in his deposition as wholly false, and to others *478 hat the deposition contained nothing hut lies. This course was unwarrantable; it was calculated to make an improper impression on the minds of those he intended as witnesses. I cannot say, in a case where these circumstances of aggravation appear, that the jury, whose peculiar province it is to estimate the damages, have erred so grossly, as to justify this court in setting aside their verdict, and that too where the judge who heard the testimony refused to disturb it, and where all the facts which operated on their decision are not in the record.
I am for affirming the judgment.
The other judges concurred. Judgment affirmed.